UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

      -against-                                                3:18-CR-0321
                                                                   (TJM)

MAXIMILIEN R. REYNOLDS,

                      Defendant.
_____

APPEARANCES:

HON. GRANT JAQUITH                    RICHARD R. SOUTHWICK, ESQ.
United States Attorney                   Assistant U.S. Attorney
Northern District of New York
Federal Building
100 S. Clinton Street
Syracuse, NY 13261

SCHLATHER, STUMBAR,               RAYMOND M. SCHLATHER, ESQ.
PARKS & SALK, LLP
Attorney for Defendant
200 East Buffalo Street
P.O. Box 353
Ithaca, NY 14850

ZIMMER LAW OFFICE PLLC            KIMBERLY M. ZIMMER, ESQ.
Attorney for Defendant
The University Building
120 East Washington Street, Suite 815
Syracuse, NY 13202

**DANIEL J. STEWART**
**United States Magistrate Judge**

## MEMORANDUM-DECISION AND ORDER

Presently before the Court is Defendant's Motion for Release from Custody pursuant to 18 U.S.C. § 3143.  The matter was referred to the undersigned by Senior United States District Court Judge Thomas J McAvoy. Text Minute Entry dated November 13, 2018; *United States v. Carretero*, 1999 WL 1034508 (N.D.N.Y. Nov. 4, 1999).  A hearing on the Motion was held on November 13, 2018.  In addition to the information presented at the hearing, the Court has also reviewed various documents, affidavits, and memoranda submitted in support of, and in opposition to, the Motion for Release.  Further, the Court requested and received additional briefing on the issue of whether the crime to which Defendant pled was a crime of violence, and the effect of that determination on the issue of release.  On November 28, 2018, the Probation Office submitted an addendum to the Pretrial Report, which has also been considered.[1]   For the reasons that follow, the Court concludes that, as Defendant has pled guilty to a crime of violence and the proposed release plan will not reasonably assure the safety of the community, Defendant's Motion is **DENIED.**

## I. FACTUAL AND PROCEDURAL HISTORY

Defendant Maximilian Reynolds was a student at Cornell University, and had a history

---

[1] In particular, the Court has reviewed the Defendant's Notice of Motion (Dkt. No. 30); the Affidavit of Raymond Schlather, Esq., with Exhibits (Dkt. No. 30-1); the Affidavit of Douglas Stern, Esq. (Dkt No. 30-2); the Affidavit of Dr. Thomas Lazzaro, with Exhibits, including the Report of Pretrial Psychological Evaluation (Dkt. No. 30-3); Defendant's Memorandum of Law (Dkt. No. 30-4); the Government's Response to Motion to Release, with Exhibits (Dkt. No. 33); the Plea Agreement (Dkt. No. 36); the July 6, 2018 Evaluation Report Prepared by the Federal Bureau of Prisons (Dkt. No. 21); the Pretrial Services Report prepared on March 23, 2018; the Addendum to the Pretrial Services Report prepared on November 28, 2018; and the Government's and Defendant's supplemental Letter-Briefs dated November 28, 2018 (Dkt. Nos. 40 & 41).

of chronic mental health issues. Pretrial Services Report, p. 2. On June 27, 2016, the Ithaca police were called to Defendant's apartment after he had ingested some LSD and attempted to jump out of his window. Govt's Response to Mot., at pp. 1-2. During that interaction with the police, Defendant had to be subdued with a taser. *Id.* at p. 2. Defendant was involuntarily committed for a short period of time, and was then voluntarily hospitalized and received mental health treatment for two weeks thereafter. *Id.* at p. 2.

Defendant then took a leave of absence from the University and began to attend a local community college. *Id.* He was noncompliant with his medicine, abused drugs, and generally was not mentally well. *Id.* In November 2017, Defendant solicited a Cornell student to conduct a straw purchase of what is referenced as an "assault-type rifle"—a Savage MSR patrol rifle. *Id.* at p. 2. That weapon was kept by Defendant, who then shortened the barrel, making it illegal to possess under both New York and Federal law. *Id.* at p. 3.

In February 2018, Defendant caught the attention of a Walmart employee because of his conduct inside the store and the fact that he had purchased a large quantity of ammunition. *Id.* at p. 3. On March 7, 2018, State and Federal investigators visited Defendant's apartment, were let in by Defendant's girlfriend, and saw certain items in plain view, including a bulletproof vest and a gas mask. *Id.* Defendant, who was at a separate location, was advised of the visit of the police by his girlfriend. *Id.* at p. 4. Defendant then allegedly provided a .25 caliber semiautomatic pistol with an obliterated serial number to a

fellow student for him to hold onto.[2]  *Id*. at p. 4.  He returned to his apartment and provided the authorities with consent to conduct the search, and that search was said to have disclosed chemicals for making explosives; over 900 rounds of rifle and shotgun ammunition, much of it in magazine clips; material for making pipe bomb; fuse cords; the Savage MSR patrol rifle with a shortened barrel; a silencer; and a bomb containing ball bearings.  *Id*. at pp. 4-5.

Defendant was arrested by the authorities on March 16, 2018, and made an initial appearance before United States Magistrate Judge Thérèse Wiley Dancks that same day. Defendant waived a detention hearing, and his counsel requested a psychological evaluation to determine Defendant's competency, which was granted.  Text Minute Entry, March 16, 2018.  Defendant was evaluated by the Federal Bureau of Prisons on April 2 and May 2, 2018, and a Forensic Report was prepared on July 6, 2018.  The Report concluded that Defendant, after having been prescribed an effective medication regime while incarcerated, did not then exhibit substantial defects due to a mental disease that would prevent him from understanding the legal process, or coordinate with his counsel to prepare and implement a defense.  Report at p. 17.  Therefore, in the opinion of Dr. Tillbrook, Defendant was competent to stand trial, despite his diagnosis of bipolar I disorder, mixed with psychotic features, and his substance abuse issues.  *Id.* at p. 12.

Defendant's counsel then entered into negotiations with the Government and Defendant entered into a plea agreement whereby he would plead guilty to a two count

---

[2] The handgun was thrown into Cayuga lake by a friend of Defendant, and was later recovered by New York State Police divers.  *Id.* at p. 4.

information charging him with a false statement during the purchase of a firearm and willfully causing an act to be done, in violation of 18 U.S.C. §§ 922(a)(6) and 2(b), as well as possession of unregistered firearms, in violation of 26 U.S.C. § 5861(d). Dkt. No. 36. The plea to those two felonies was entered by Defendant, with the assistance of counsel, and accepted by the Court, on November 13, 2018. Text Minute Entry, Nov. 13, 2018. Sentencing before the District Court is presently scheduled for March 11, 2019. *Id.*

## II.  MOTION FOR RELEASE POST-PLEA

### A.  Factual Basis for the Motion and the Government's Objections

Defendant has remained in custody since his initial arrest and is presently housed at the Albany County Correctional Facility. Defendant now moves the Court to be released pending sentencing, under certain conditions. Def.'s Not. of Mot. Specifically, Defendant requests that the Court direct his confinement be at a private mental health facility so that he may receive appropriate mental health care prior to the imposition of a sentence. Lazzaro Aff'd; Stern Aff'd.

In support of the application for release, Defendant points to his lack of any prior criminal history; his youth and his intelligence; his strong support from family and friends; and the fact that the conduct charged was simply defensive in nature, in that there were no threats of violence, developed plans, or selected targets. Schlather Aff'd at ¶¶ 5-17. Counsel also points to Defendant's chronic mental health illness, which has now been diagnosed as schizoaffective disorder, bipolar type, and which is actively being treated. *Id.* at ¶¶ 18-21.

Counsel has provided to the Court an extensive release plan which would involve secure transport; inpatient treatment at two separate facilities; high bail; and electronic monitoring. *Id.* at ¶¶ 24-28.  It is also represented to the Court that at each facility Defendant would be the subject of 24/7 security; would be held behind locked doors; and the treatment plans would not be changed without advance notice to, and approval by, the Court and/or Probation.  Stern Aff'd at ¶¶ 11-13; Schlather Aff'd at ¶ 27.

A Psychological Evaluation by Drs. Kohlbrenner and Lazzaro was provided to the Court.  Lazzaro Aff'd, Exhibit B.  That analysis is extensive, but concludes that "[o]nce Mr. Reynolds receives consistent administration of his medications and the appropriate therapies, his psychosis will clear" and he will not present a danger to himself or to any person and the community, and can be released to a treatment facility to address his psychiatric and substance abuse issues, including incorporating visits to his family.  *Id.* at p. 18.

The Government opposes release and states in a direct fashion: "Maximilien Reynolds has a documented and incontrovertible history of evading, defeating, and ignoring mental health treatment and associated prescribed drug therapy, and thereby presenting extreme danger to the public and himself."  Govt's Resp. at p. 6.  "The sheer volume of destructive power available to Maximilien Reynolds could have taken the lives of dozens of people, and injured scores of others.  His history of mental illness and his abuse of both prescribed and illegal drugs coupled with the lethality he gathered over a period of months present a horrifying set of possibilities."  *Id*. at p. 8.

Upon review of Defendant's submissions, the Court requested that the Federal Probation Office inquire with the proposed treatment facilities regarding their security. The result of that inquiry is as follows: with regard to the initial short-term treatment facility, Probation confirms that the doors would be locked and Defendant would be only allowed to leave with an escort. Addendum to Pretrial Report at p. 1. After Defendant is stabilized, the treatment team could give permission for him to go about the grounds. *Id.* Because this would be a voluntary commitment, patients can sign themselves out of treatment, but they are required to give the facility 48 hours notice, and the facility would agree to notify the Court if this request was ever made by the Defendant. *Id.* The procedures at the long-term care facility, however, are not as stringent, as Defendant would be, from a mental health perspective, stabilized at the time of his arrival. His program would not be secure, he would not be locked in, and he could freely walk around campus. *Id.* Further, there is no procedure for forcing him to stay at the Facility. *Id.* The Facility would notify the Court if he did leave, provided that appropriate releases were signed. *Id.* at p. 2  In light of this information and Defendant's background, the Probation Office recommends detention pending sentencing. *Id.* at p.1.

### B. Statutory Framework

Because Defendant is requesting release after entering a plea, the standard to be employed by the Court is found in 18 U.S.C. § 3143. Under section 3143(a)(1), where a criminal defendant is awaiting sentence, and where the guidelines recommend imprisonment,

the defendant is to be detained unless the court finds by clear and convincing evidence that the defendant is not likely to flee or pose a danger to the community, in which case the court shall order release. "18 U.S.C. § 3143(a)(1) creates a presumption in favor of detention; it places the burden on the defendant to defeat that presumption; and it requires the defendant to carry that burden by clear and convincing evidence, not by a mere preponderance." *United States v. Abuhamra*, 389 F.3d 309, 320 (2d Cir. 2004).  Such a showing is materially different than what would have controlled had Defendant made an application for release at arraignment, where, absent an applicable presumption, it would have been the Government's burden to prove that Defendant was a danger or a risk of flight.  In addition, it is clear from the statutory mandate that the traditional presumption favoring pretrial release for the majority of federal defendants, *see United States v. Salerno*, 481 U.S. 739, 755 (1987), does not apply once the defendant has entered a plea and has thereby acknowledged his guilt. *United States v. Carretero*, 1999 WL 1034508, at *2.  Moreover, the standard of clear and convincing is an exacting one requiring that the evidence support the desired conclusion with "a high degree of certainty." *United States v. Chimurenga,* 760 F. 2d 400, 405 (2d Cir. 1985).

An additional element applies in situations where the defendant is charged with, *inter alia*, a crime of violence where a maximum term of ten years or more is authorized.  18 U.S.C. § 3143(a)(2) (incorporating by reference 18 U.S.C. § 3142(f)(1)(A)).  In such a case, the court *must* detain the defendant unless the aforesaid standards of lack of flight risk and

lack of danger to the community are met *and* "the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted" *or* "an attorney for the Government has recommended that no sentence of imprisonment be imposed upon the [defendant]." *Id.* (emphasis added); *e.g. United States v. Sapp*, 139 Fed. Appx. 352 (2d Cir. 2005). The bail statute defines a "crime of violence" as "(A) an offense that has as an element . . . the use, attempted use, or threatened use of physical force against the person or property of another; (B) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force . . . may be used in the course of committing the offense; or (C) [certain specified sex offenses]" 18 U.S.C. § 3156(a)(4). In order to be a crime of violence under subdivision (B), the offense "must satisfy five distinct elements, including 1) the offense must be a felony; 2) the offense must involve a 'risk that physical force may be used against the person or property of another;' 3) that risk must flow from the nature of the offense; 4) the risked use of physical force must be such as would occur 'in the course of' commission of the offense; and 5) that risk must be 'substantial.'" *United States v. Fernandez*, 144 F. Supp. 2d 115, 121 (N.D.N.Y. 2001) (quoting *United States v. Dillard*, 214 F.3d 88, 92-93 (2d Cir. 2000) *cert. denied,* 532 US 907 (2001)).

Finally, a defendant convicted of a crime of violence and awaiting sentencing who cannot satisfy the criteria set forth in § 3143(a)(2) may nevertheless be released if (1) the district court finds that the conditions of release set forth in § 3143(a)(1) have been met, *and* (2) "it is clearly shown that there are exceptional reasons why [the defendant's] detention

would not be appropriate." 18 U.S.C. § 3145(c); *see United States v. DiSomma*, 951 F.2d 494, 496 (2d Cir. 1991). Exceptional circumstances exist where there is "a unique combination of circumstances giving rise to situations that are out of the ordinary." *United States v. DiSomma,* 951 F.2d at 497; *see also United States v. Lippold*, 175 F. Supp. 2d 537, 540 (S.D.N.Y. 2001) (collecting cases and noting that "circumstances that are 'purely personal' do not typically rise to level of 'exceptional' warranting release.").

### C. Analysis

In his Motion, Defendant initially argues that under section 3143(a)(1) he would not be a risk of flight or a danger to the community if released under the treatment plan proposed. In the Court's view, it must first consider whether the additional requirements of section 3142(a)(2) apply. In the present case, possession of an unregistered weapon is not an offense that contains as an element the use of physical force, nor is it a sex offense. Is it, however, a crime of violence for purposes of the bail statute? Under 18 U.S.C. § 3143(a)(2), the question becomes whether, either because the nature of the offender, or the nature of the offense, there is a substantial risk of physical force being used.

In *United States v. Dillard*, the Second Circuit held that under this definition, the crime of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g) constituted a crime of violence. 214 F.3d 88, 104 (2d Cir. 2000).[3] The Second Circuit

---

[3] There was a split in the circuits on this issue. *See, e.g., United States v. Bowers*, 432 F.3d 518, 522 (3d Cir. 2005) ("[W]e find *Dillard*'s reasoning unpersuasive. . ."). That issue, however, has been effectively resolved by the 2008 amendment to 18 U.S.C. § 3142, which added subdivision (f)(1)(E) which specifically made reference to possession or use of a weapon or a destructive device. As there was no corresponding amendment to 18 U.S.C. § 3143, the Court
(continued...)

reasoned that "'by its nature,' the offense of illegal gun possession by a person previously convicted of a felony offense (not including business-regulating offenses), 'involves a substantial risk that physical force … may be used in the course of committing the offense.'" *Id.* at 94-95.  In *Dillard*, the Court concluded that the possession of the weapon, *coupled with* the nature of the criminal defendant, created the substantial risk of the use of physical force against the person or property of another, and warranted the designation of a crime of violence.  *Id*.  Utilizing that rationale, some courts have persuasively concluded that mere possession of a firearm by someone other than a felon is not a crime of violence.  *United States v. Fernandez*, 144 F. Supp. 2d 115, 122 (N.D.N.Y. 2001) ("[A] person trafficking in stolen firearms may not present the same level of risk perceived by the majority in *Dillard* as those qualifying as felons under the statute.'); *United States v. Carter*, 996 F. Supp. 260, 265 (W.D.N.Y. 1998).  Here, as properly noted by defense counsel, Defendant has no prior criminal history.

However, the offense of possessing an unregistered weapon in violation of 26 U.S.C. § 5861(d) presents its own unique and inherent dangers.  Under that statute, certain specific types of firearms are required to be registered in the national firearms registry:

> The express purpose of the National Firearms Act (26 U.S.C.A. §§ 5801 et seq.), as well as the Omnibus Crime Control and Safe Streets Act (18 U.S.C.A. §§ 921 et seq.), was to control the traffic in, and regulate and outlaw, certain types of extremely dangerous or powerful weapons and high explosives.

---

[3](...continued)
is required to utilize the crime of violence analysis, and to apply the rationale of *Dillard*.

>Congress had found that the ease of all persons acquiring such firearms, which were much more powerful than conventional rifles and shotguns, was a significant factor in the prevalence of lawlessness and violent crime in the United States. The statutes, therefore, were designed to generally restrict individuals from possession of such "destructive devices," or to require such weapons to be registered.

126 A.L.R. Fed. 597 (Originally published in 1995).

Therefore, section 5861 criminalizes the possession alone of particularly dangerous firearms, such as sawed-off shotguns, bombs, and other weapons that Congress has determined are inherently dangerous and lack any legitimate purpose.[4] As noted by the Fifth Circuit "Congress passed [this law] in response to gangster-style violence after observing that 'there is no reason why anyone except the law officer should have a machine gun or sawed-off shotgun.'" *United States v. Serna*, 309 F. 3d 859, 863 (5th Cir. 2002). Even courts that have rejected the argument that a felon in possession is a crime of violence, have nonetheless concluded that possession of inherently dangerous weapons is. *United States v. Allegree,* 175 F.3d 648, 651 (8th Cir. 1999) ("The reason [the defendant's] conviction for possession of [a sawed-off shotgun] counts as a crime of violence is because of the type of weapon involved. This distinguishes his offense from simple possession of a firearm by a felon.").

The Second Circuit has not specifically decided this precise matter. *See United States*

---

[4] "Congress added bombs to the list of weapons for which unregistered possession was a crime in 1968. Congress expanded the scope of the National Firearms Act in this manner because of its 'specific declaration and finding that destructive devices (such as bazookas, mortars, antitank guns, bombs, missiles, etc.,) machine guns, short-barreled shotguns, and short-barreled rifles are primarily weapons of war and have no appropriate sporting use or use for personal protection.'" *United States v. Jennings*, 195 F.3d 795, 799 (5th Cir. 1999) (citing S. Rep. No. 90–1501, at 28 (1968)).

*v. Sapp*, 139 Fed. Appx. 352 (2005) (finding it was not necessary to reach the issue in light of defense counsel's concession that the illegal possession of a sawed-off shotgun constituted a crime of violence). However, relying upon the rationale of *United States v. Dillard*, this Court's view is that the possession of the types of weapons at issue here - an illegally modified Savage MSR-15 rifle, a pipe bomb, and a silencer - logically fall within the crime of violence definition. In particular, these items are inherently deadly, pose a great risk to the public, and lack usefulness except for violent criminal purposes. As in *Dillard*, it is the Court's view that among the people who would illegally possess bombs, silencers, and illegally modified assault-type rifles, the number who do so with the intent to threaten or cause violence is significant. Accordingly, the Court concludes that the crime of possession of bombs, silencers and modified weapons involves a substantial risk of violence, and therefore is a crime of violence. *United States v. Stratton*, 2001 WL 527442, at *3 (D. Ariz. Apr. 24, 2001) (concluding that unlawful possession of a sawed-off shotgun in violation of section 5861(d) was a "crime of violence" within the meaning of the Bail Reform Act); *United States v. Dodge*, 842 F. Supp. 643, 644-45 (D. Conn. 1994) (holding that a pipe bomb and a silencer were destructive devices under 18 U.S.C. § 3156, and their illegal possession constituted a crime of violence without a showing that they were actually used); *United States v. Spires*, 755 F. Supp. 890, 893 (C.D. Cal. 1991) (holding that "the offense of unregistered firearm possession, 26 U.S.C. § 5861(d), by its very nature, involves a substantial risk that physical force against the person or property of another may be used in

the course of the unlawful possession. Therefore, this offense is a crime of violence as defined in 18 U.S.C. § 3156(a)(4)(B).").

Having found that Defendant committed a crime of violence under the Bail Reform Act, section 3143(2) which requires detention unless:

> (A)(i) the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted; or
> (ii) an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and
> (B) the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community.

Under this framework, the Court must find both that one of the section 3143(2)(A) criteria had been met and that Defendant is neither a risk of flight nor a danger to the community under section 3143(2)(b). *See United States v. Rodriguez*, 539 F. Supp. 2d 592, 599-600 (D. Conn. 2008)*; United States v. Schlesinger*, 2005 WL 1657043, at *2 (E.D.N.Y. June 8, 2005) ("Section 3143(a)(2) in effect requires the remand of the Defendant in this case unless the Defendant can show: (1) 'that there is a substantial likelihood that a motion for acquittal or new trial will be granted;' and (2) that the Defendant is unlikely to flee or pose a danger under section 3143(a)(1)."). Because Defendant has not made the showing required, his request for release must be denied.

There is little question that Defendant cannot satisfy the requirements of section 3143(a)(2)(A). Having entered into a negotiated plea agreement, which includes a waiver of his right to appeal many issues, Defendant simply offers no grounds on which this Court could find a "substantial likelihood" that he would be entitled to a new trial. 18 U.S.C. §

3143(a)(2)(A)(i). Similarly, it is clear that the Government intends to seek an term of imprisonment here. The Government and Defendant have entered into a Plea Agreement. Dkt. No. 36. Pursuant to that Plea Agreement, the Government will be arguing for a sentence between fifty-seven and seventy-one months, and Defendant has waived his right to appeal a sentence of fifty-seven months or less. *Id.* at ¶¶ 7 & 8. As Defendant was originally arrested on March 7, 2018, and therefore has been detained for a period of nine months, it is evident that the Government is recommending that the Court impose an additional sentence of imprisonment. This fact prohibits the Court from releasing Defendant under section 3143(a)(2)(A)(ii). *United States v. Sapp*, 139 Fed. Appx. 352 (holding that the District Court clearly erred in granting a bail application where the Government sought a term of imprisonment).

Nor has Defendant, at a basic level, shown by clear and convincing evidence that he "is not likely to . . . pose a danger to any other person or the community." 18 U.S.C. § 3143(a)(2)(B).[5] There is no question that Defendant is in need of significant mental health treatment and appropriate medication. He is receiving that medication now, and has apparently also benefitted by the biweekly counseling sessions provided by Defendant's family, and accommodated by the detention facility. With that assistance he has not only been determined to be competent, but has had no disciplinary difficulties at the Albany County Correctional Facility whatsoever. Govt's Resp., Exhibit 12. There appears to be no

---

[5] Based on the record before the Court, I believe that I could set conditions that would ameliorate any risk of flight potentially posed by Defendant.

dispute that Defendant's mental health condition has greatly improved since he was incarcerated. Defendant's counsel and his expert do note that there was one occasion where Defendant was not provided proper medication at the jail, apparently due to an oversight, and within short order Defendant regressed to the point where he had increased hallucinations and was, at times, unable to complete a sentence. Lazzaro Aff'd, Exhibit C. The medication was then restored, as was Defendant's functionality. *Id*. There is no indication that this event, or failure, has ever been repeated. In the view of defense counsel, these facts warrant Defendant's immediate release to a private hospital facility where he can receive enhanced mental health treatment in a secure environment.

The Court, however, views the situation differently.[6] First, what is underscored is how rapidly Defendant's mental health can decline when he is off of his medication. In addition, when outside of a structured setting, Defendant has already shown his propensity both to be noncompliant with his medication, as well as to engage in inherently dangerous conduct. It is important to note that Defendant's doctors' assessment was that Defendant would not be a danger to either himself or to the community *so long as* he is receiving "consistent administration of his medications and the appropriate therapies." Lazzaro Aff'd, Ex. B at p. 18. The Court understands this to mean that were there to be an interruption or discontinuance of either medication or treatment, Defendant would then pose a danger. This

---

[6] Even if the Court were to have concluded that Defendant had not pled guilty to a crime of violence, the same facts described below would result in the Court finding that Defendant is a danger to the community precluding his release under section 3143(a)(1).

is certainly consistent with the other evidence that the Court has been provided.

While Defendant's counsel acknowledges Defendant's serious mental health issues, he asked the Court to concentrate on Defendant's presently improved state, and the fact that continued mental health care can be better provided at the private health facilities proposed, rather than at the Albany County Correctional Facility. Counsel assures the Court that the provision of these mental health services could be provided in as secure and "locked in" a setting as he is presently receiving, so that society's interests will be protected:

> "[W]hat Mr. Reynolds is seeking is confinement in a secure mental heath institution, where his movements will be constantly monitored -- and where his ability to leave the institution is virtually non-existent."

Def.'s Mem. of Law at p. 7.

In light of the subsequent information provided to the Court by the Probation Office, however, it does not appear that the secure environment to be provided by the proposed treatment facilities is what defense counsel believed it to be at the time of the Motion. With regard to the second proposed facility, at least, it does not appear that there will be any physical barrier or person who will provide any certainty that Defendant will not simply leave. Were Defendant to leave and discontinue his medication, all the dangers to society shown by Defendant's prior conduct, and recognized by his own mental health professionals, would, in all likelihood, return. While the Court has the option of ordering electronic monitoring, the history of this district demonstrates that such a condition, while helpful if it is properly monitored, does not ensure a defendant will stay at a particular location.

The Court is not unsympathetic to Defendant's need for mental health treatment, or the importance of mental health treatment for his overall well-being. Nevertheless, in light of the inherently dangerous activity that Defendant engaged in and the risk that he poses to society if he goes untreated, or absconds, I do not believe that the conditions at the proposed treatment facilities would be sufficient to secure Defendant, and thus reasonably assure the safety of the community.[7]

Accordingly, it is hereby

**ORDERED**, that Defendant's request for release pending sentencing is hereby denied; and it is further

**ORDERED**, that in light of the personal medical and mental health information contained withing the submissions to the Court by both Defendant and the Government, those submissions shall remain sealed.

Dated: December 10, 2018
       Albany, New York

_____
Daniel J. Stewart
U.S. Magistrate Judge

---

[7] Given these conclusions, the Court does not reach the question of whether Defendant has established "exceptional reasons" that might justify his release under 18 U.S.C. § 3145(c). *See United States v. Luciano*, 108 F.3d 1370 (2d Cir. 1997) (requiring a finding that Defendant poses no risk to community as predicate to consideration of exceptional reasons exception in section 1345(c)); *United States v. Lippold*, 175 F. Supp. 2d 537, 539 (S.D.N.Y. 2001) (same). Having asked the parties to brief the issue, I note briefly that were I to reach it, I would find that he has not. Initially, exceptional circumstances are not created simply as a result of Defendant's mental health issues. In fact, it is presumably because of these mental health issues that Defendant was caused to act in the manner for which he is now charged, which by definition creates the presumption in favor of detention. On the other hand, the Court accepts the possibility that the availability and need of alternative medical or mental heath care, unavailable in a custodial setting, could support such a finding, so long as the remaining criteria regarding lack of dangerousness and lack of flight are satisfied. The Court does not believe that the evidence presented rises to the level of exceptional circumstances, especially where Defendant appears to be doing reasonably well while incarcerated with the exception of a single occurrence that now appears to have been corrected. Most importantly, as noted above, the burden regarding lack of dangerousness has not been satisfied by the Defendant.